FILED
2006 Jul-18  AM 11:53
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### EASTERN DIVISION

| | |
|---|---|
| **HEATHER BUSINELLE,** } | |
| } | |
| **Plaintiff,** } | |
| } | **Case No.: 1:05-CV-0554-VEH** |
| **v.** } | |
| } | |
| **MEADOWCRAFT, INC. D/BA/** } | |
| **PLANTATION PATTERNS** } | |
| **AND TYRONE BROWN** } | |
| } | |
| **Defendants.** | |

## <u>OPINION</u>

This Court has before it the January 23, 2006 motion of Defendant Meadowcraft, Inc. D/B/A Plantation Patterns ("Defendant Meadowcraft") for summary judgment as to Plaintiff Heather Businelle's claims (Doc. 24).   For the reasons set forth below, the Defendant's motion for summary judgment is due to be denied in part and granted in part as to Plaintiff's federal discrimination and state law claims.

### I.  Procedural History

Plaintiff Heather Businelle commenced this action on March 16, 2005, by filing a complaint in this Court alleging violations of Title VII of the Civil Rights

1

Act of 1964, as amended, 42 U.S.C. § 2000e et seq., the Civil Rights Act of 1991, and 42 U.S.C. § 1981a. Plaintiff Businelle also alleged state law claims of invasion of privacy, assault and battery, and negligent and/or wanton and malicious hiring, supervision, and retention.[1]

Plaintiff Businelle alleges in her complaint that she was subjected to unwelcome acts of sexual harassment by her immediate supervisor, Tyrone Brown. Plaintiff Businelle contends that Defendant Meadowcraft subjected her to a sexually hostile work environment and a hostile work environment based on gender that discriminatorily altered the terms and conditions of her employment. Plaintiff Businelle contends that she worked in an environment so hostile and abusive that she was forced to abandon her position against her will. Plaintiff alleges an invasion of privacy claim against both Defendants, Tyrone Brown and Meadowcraft ("Defendants"), on the grounds that the Defendants intruded into her private seclusion. Plaintiff Businelle also asserts an assault and battery claim against Defendant Meadowcraft because Defendant Brown allegedly assaulted and battered Plaintiff Businelle by subjecting her to unwanted touchings and Defendant Meadowcraft authorized, ratified, and/or condoned Tyrone Brown's, an agent of

---

[1] Plaintiff's negligent hiring claim alleged in her complaint was dismissed by the Court on November 29, 2005, in an order granting the Plaintiff's unopposed motion to dismiss that claim. (Doc. 21).

Defendant Meadowcraft, actions.  Plaintiff Businelle contends that the Defendant Meadowcraft maliciously, deliberately, wantonly, and/or negligently failed to supervise, monitor, and/or train its employees and it maliciously, deliberately, wantonly, and/or negligently retained employees engaging in unlawful conduct.

On January 23, 2006, the Defendant Meadowcraft filed a motion for summary judgment[2] asserting: (1) that Plaintiff Businelle cannot establish a prima facie case of gender discrimination because she cannot demonstrate that Defendant Brown's alleged conduct was based upon her gender and/or  that the alleged conduct rises to the severe or pervasive level necessary for a hostile environment claim; (2) that Plaintiff Businelle cannot establish a hostile work environment sexual harassment  claim because she cannot satisfy the fifth element of the prima facie case that Defendant Meadowcraft is liable for the alleged sexual harassment; (3) that Plaintiff Businelle cannot establish that she was constructively discharged; (4) that Plaintiff Businelle cannot establish a jury issue as to malice and reckless indifference on the part of a Meadowcraft employee sufficiently high up in the corporation engaging in discrimination; (5) even assuming that Plaintiff Businelle can meet her burden of establishing a question of fact as to the issue of punitive

---

[2] The motion for summary judgment was filed by Defendant Meadowcraft, as to all claims against it, and not Defendant Tyrone Brown.

3

damages, Defendant Meadowcraft cannot be held liable for punitive damages because it may assert a defense to vicarious liability where the employment decisions of the managerial agent are contrary to the employer's good faith efforts to comply with Title VII; (6) that Defendant Meadowcraft is not liable for Defendant Brown's alleged invasion of privacy and assault and battery of Plaintiff Businelle; and (7) that Plaintiff Businelle cannot establish her negligent retention and negligent supervision claims.

The Defendant Meadowcraft has submitted evidence[3] in support of its motion for summary judgment and filed a supporting brief on January 23, 2006. On February 10, 2006, the Plaintiff filed a brief and evidence[4] in opposition to the Defendant's motion for summary judgment. The Defendant Meadowcraft filed a reply brief on February 24, 2006.

## II.  Standard of Review

### A.  Summary Judgment

---

[3] The Defendant submitted the depositions of Plaintiff Heather Businelle, Gerry Tapley, Kay Brooks, Tyrone Brown, Larry York, and Cathy Businelle all with attached exhibits . The Defendant also submitted Meadowcraft's voluntary petition for relief under Chapter 11, Meadowcraft's second amended and restated plan of reorganization under Chapter 11, bankruptcy confirmation order dated August 21, 2003, bankruptcy notice of effective date and certain deadlines filed September 3, 2003, bankruptcy order granting motion for final decree, and bankruptcy order adopting its September 24, 2004 order as the final decree.

[4] Plaintiff Businelle submitted the declaration of Heather Businelle and Cathy Businelle.

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Chapman v. AI Transport, 229 F.3d 1012, 1023 (11th Cir. 2000). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp., 477 U.S. at 323. Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions of file, designate specific facts showing that there is a genuine issue for trial. Id. at 324.

The substantive law will identify which facts are material and which are irrelevant. Chapman, 229 F.3d at 1023; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. Chapman, 229 F.3d at 1023; Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party." Anderson, 477 U.S. at 248; Chapman, 229 F.3d at 1023. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. Anderson, 477 U.S. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial. See Fitzpatrick, 2 F.3d at 1115-17 (citing United States v. Four Parcels of Real Property, 941 F.2d 1428 (11th Cir. 1991)(en banc)). If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial. Fitzpatrick, 2 F.3d at 1115. Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial. Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed

verdict at trial.  The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to <u>affirmatively</u> show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case.  <u>Fitzpatrick</u>, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts.  <u>Lewis v. Casey</u>, 518 U.S. 343, 358 (1996) (citing <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 561 (1992)).

### III.  Relevant Facts[5]

Meadowcraft is a manufacturer of wrought iron patio furniture.  (Pl. Dep. 62; York Dep. 13, 14). It has manufacturing facilities in Birmingham, Selma, and Wadley, Alabama. (York Dep. 11). Meadowcraft's corporate office is in Chelsea, Alabama. (Tapley Dep. 30; York Dep. 8-9).  Since the demand for patio furniture varies greatly throughout the year, Meadowcraft is a seasonal business. Therefore Meadowcraft lays off and subsequently recalls workers every year.  (Tapley Dep. 53; York Dep. 10, 13). In peak production season, the Wadley plant sometimes will operate a second shift. (Tapley Dep. 51, 54). The lowest time for production is the summer. (Tapley Dep. 53, 54; York Dep. 13).

Meadowcraft has sexual harassment and equal opportunity policies which are distributed annually to its hourly employees upon rehire from each seasonal lay-off. (York Dep. 91; Pl. Dep. Ex. 2,3,4; Brooks Dep. 23,24,36,37; Brown Dep. 180; Tapley Dep. 72). Meadowcraft even distributes copies of these policies in Spanish for its Hispanic employees. (York Dep. 92). Meadowcraft's sexual harassment policy also is contained in its code of conduct (York Dep. 92) and its Collective Bargaining Agreement with the Union contains a provision preventing

---

[5] Pursuant to Rule 56 of the Federal Rules of Civil Procedure, the facts are presented in the light most favorable to the Plaintiff.  Facts are undisputed unless otherwise expressly noted.

discrimination based on sex. (Tapley Dep. Ex. 10 at Art. 4). "Harassment of any kind toward an employee... based on... sex..." is listed a most serious offense in the "Group One" rules and company rules. (Brooks Dep. Ex. 1; Tapley Dep. Ex. 14). Meadowcraft trains its salaried and management employees on issues relating to harassment and discrimination annually by bringing in outside speakers. (York Dep. 49,51,53,90,91; Brooks Dep. 15,16; Brown Dep. 170,171, 173-177 ).

Businelle received Meadowcraft's sexual harassment and equal employment policies and Group One rules in January 2002, October 2002, and September of 2003. (Pl. Dep. 78, 81, 83; Ex. 2-4). Businelle has no trouble reading. (Businelle Dep. 230). Plaintiff asserts that no one discussed the sexual harassment policy with her; rather, employees signed it along with a bunch of papers that were kept only by the Defendant. (Businelle Dep. 79, Pl. Decl., C.Businelle p. 141) No posted sexual harassment policies existed in the building where Businelle worked. (Businelle Dep. 78-80; Tapley Dep. 182). Defendant Meadowcraft's sexual harassment policy gave Businelle the option of reporting sexual harassment to her supervisor, plant manager, or human resources manager. (Tapley Dep. Ex. 11). Defendant Meadowcraft did not have an anti-retaliation policy. (Tapley Dep. 127-128).

Businelle was hired by Meadowcraft to work at its Wadley plant on or about

January 18, 2002. (Pl. Dep. Ex.1). Except for a short time at the beginning of her employment and when she was promoted to assistant lead by Brown and subsequently demoted, at all times prior to her resignation in late April 2004 (except during periods of seasonal lay off), Businelle worked as a robot operator in department 775. (Pl. Dep. Ex. 5,6 ; Tapley Dep. Ex. 24). At certain times during her employment she worked on the first shift and at certain times she worked on the second shift. (Tapley Dep. Ex. 24). In September of 2003, Businelle was recalled from layoff to first shift. (Tapley Dep. Ex. 24 at M0221). Meadowcraft records show that on October 6, 2003, Businelle transferred to second shift. (Tapley Dep. Ex 24 at M0023).

During Businelle's employment Tyrone Brown served as a Robot Technician when there was only  a first shift and he served as a night shift supervisor over department 775's second shift when such a shift was in operation. (Tapley Dep. 39, 50; 56-57; 66-67; 75-76; 113; 140-141; 149; 159-160; 183; 207; Brown Dep. 14; 19-20; 22-24; 27-29; 64-70;York Dep. 58, 59).  Brown had no supervisory duties over her when Brown worked on first shift. (Pl. Depo. 77; York Dep. 58).  As Businelle's second shift supervisor, Brown told Businelle what to do, was the only supervisor in the building where Businelle worked, and was the highest authority in the plant over Businelle at night.  (Tapley Dep. 39, 57-58, 75-76, 140-141, 149,

159-160, 183, 207; Brooks Dep. 47, 59-60, 69, 73-74, 189; Brown Dep. 14, 104, 109, 169, 200, 249; Tapley Dep. Ex. 6).  As the second shift supervisor, Brown signed the paper terminating Businelle and he constantly told Businelle he was going to fire her.[6] (Tapley Dep. Ex 9; Businelle p. 107-108, 134, 150-151, 169-170, 212).   Businelle does not base her claim on the conduct of anyone other than Tyrone Brown. (Pl. Dep. 84,85). Businelle does not claim that Brown ever made any inappropriate comments to her when she worked on the first shift. (Pl. Dep. 89).

At some point in 2002, Brown allegedly asked Businelle if she was a virgin. (Pl. Dep. 86, 286.) Businelle never reported this comment to anyone at Meadowcraft and no one overheard it. (Pl. Dep. 86, 88).  At some point when Businelle began working the second shift, "continuously every night," "three times a day" Brown whispered to her that he wanted to have sex with her. (Pl. Dep. 88,89,101, 109,120). She would tell him no, he would get angry, he would tell her she was fucking stupid "every time [she] refused him" and walk away. (Pl. Dep. 90, 91, 100,120). In response to Brown's requests for sex, Businelle told him no and to leave her alone, which caused Brown to become hostile.  (Businelle Dep. 90-91,

_____

[6] The Defendant contends that as a temporary supervisor over second shift, Brown had no authority to hire or fire employees. (York Dep. at 59; Brown Dep. 73).

120-121).  When Businelle rejected Brown, he threatened to fire Businelle telling her he was her "goddam" boss, he could fire her and get her "ass" out of there, and he could fire anybody without reason.  (Businelle Dep. 108, 134, 169-170, 212). Businelle did not tell anyone other than a co-worker who was her best friend. (Pl. Dep. 89,90).

Also in 2003, when Businelle worked the second shift, on one occasion Brown asked her out to the movies and out to eat, and told her she was pretty and the kind of woman every man needed.  (Pl. Dep. 122, 131).  Between October 2003 to December 2003, every time he spoke with her, Brown asked Businelle when she was going to break up with her boyfriend and date him instead. (Pl. Dep. 184, 185).

At some point between October 2003 and January 2004, Businelle was transferred back to first shift where Brown was not her supervisor and she did not have to talk to Brown. (Tapley Dep. Ex. 24 at M0221, M0223; Pl. Dep. 67, 121). In January 2004, Businelle was asked by her first shift supervisor Malinda Jackson whether she wanted to work first or second shift and Businelle told her she wanted to work on second shift. (Pl. Dep. 67,68). Businelle knew when she told Jackson she wanted to work on second shift that Brown would be her supervisor when she transferred. (Pl. Dep. 68). Although Businelle agreed to second shift, she had no choice because her mother, with whom Businelle had to ride to work, had already

12

volunteered for second shift. (Businelle Dep. 68, 145). Second shift paid a higher wage. (Businelle Dep. 67-68, 73). Pursuant to her request, Businelle was transferred to second shift in late January 2004 and worked there until she quit. (Businelle Dep. 76; Tapley Dep. Ex. 24).

When she went back to second shift under Brown in late January 2004, Brown resumed telling her he wanted to have sex with her. (Pl. Dep. 121). On one occasion, Brown grabbed her arm and shoved her into the robot door. (Pl. Dep. 204). No one saw this and she never reported it. (Pl. Dep. 241, 260). On another occasion, he grabbed her arm once and told her she had a nice ass. (Pl. Dep. 240). Businelle never reported to anyone that he had grabbed her arm or complimented her buttocks. (Pl. Dep. 242, 243, 260). Brown allegedly left finger bruises on her arm twice. (Pl. Dep. 244). Businelle never reported to anyone at Meadowcraft that she had bruises. (Pl. Dep. 244, 260). Brown would rub his chest against Businelle's arm when he was getting down to whisper in her ear and again when he leaned back up. (Pl. Dep. 182, 183). Plaintiff Businelle alleges she told Wadley Human Resources Manager Kay Brooks that Brown was touching and rubbing against her. (Businelle p. 68, 145).

Businelle's mother, Cathy Businelle, also worked at Meadowcraft in the same department as Plaintiff Businelle and they usually worked the same shift. (Pl.

Dep. 59).  She worked directly beside her daughter three or four nights a week and never overheard Brown say anything sexual to Businelle. (C. Businelle Dep. 63; Pl. Dep. 91, 92). Businelle did not tell her mother about Brown's alleged comments until "about a month" before they quit in late April 2004. (Pl. Dep. 91,92; C. Businelle at 67, 68).  On the same day she told her mother, Businelle told a first shift supervisor, Paul Smith, who was not her supervisor at that time, that Brown had called her "fucking stupid." (Pl. Dep. 94). Businelle told him because he asked why she was upset and he was her friend. (Pl. Dep. 94,95).

On or about April 12, 2004, Brown whispered to Businelle that he would make her pussy wet for two days and asked her if he could hug and kiss her before he went home. (Pl. Dep. 122, 130, 131).  The next day,  April 13, 2004, at her mother's suggestion,  Businelle and her mother went to see Wadley Human Resources Manager Kay Brooks before their shift started.   (Tapley Dep. Ex. 12; Pl. Dep. 192). Businelle informed Brooks that Brown had told her the previous evening that he wanted to make her pussy wet for two days, that he had wanted to hug her before she left, he was constantly cursing at her, that no one had heard the vulgar comments because he whispers them, and that he had been ignoring her. (Pl. Dep. 193; Tapley Dep. Ex. 12). Businelle alleges she told Brooks that Brown would rub against her when he leaned down to whisper. (Pl. Dep. 258). Businelle's

mother, Cathy, told Brooks she had not heard the comments. (Pl. Dep. 192,193; C. Businelle Dep. 97, 171; Brooks Dep. 62). Businelle did not limit her report to what happened the previous night; rather she told Brooks that Brown was asking her could he "fuck" her, was touching her, and cursing her nightly. (Businelle Dep. 130-131, 147, 188, 193, 257-258).

On April 13, 2004 Brooks called Vice President Administration and Human Resources, Larry York, who works at the corporate office in Chelsea and informed him that Businelle had made a complaint. (York Dep. 9, 17, 37, 44, 47). York instructed her to immediately investigate the complaint. (York Dep. 45, 48). Also on that day, Brooks informed Production Manager Gerry Tapley of what Businelle had reported to her. (Tapley Dep. 60, 61, Ex. 6).

Tapley called Brown in his office and asked Brown if he had been cursing and yelling out on the floor at Businelle. (Brown Dep. 183-185). Brown said he had not. (Brown Dep. 183; Tapley Dep. 64, 111). Tapley told Brown that if he found out the truth and that if any of Businelle's allegations were true, he would fire him on the spot. (Brown Dep. 183; Tapley Dep. 111). Although Tapley alleged he met with Brown, and spoke to him about him making sexual comments and advances to Businelle and cursing her, Brown testified that Tapley never asked him whether he had been making sexual comments or advances towards Businelle, and

only asked him if he had been cursing and yelling at Businelle.  (Brown Dep. 183-186, 189; Tapley Dep. 110; Tapley Dep. EX 6; Brooks Dep. 57).

Businelle claims that Brown did not talk to "nobody" the night she made the complaint and "wouldn't fix our robots" and "was being hateful to everybody because he got in trouble." (Pl. Dep. 137, 148, 149).  Brooks also spoke with the quality supervisor on the second shift, Elaine Drake, as part of the investigation. (Brown Dep. 14; Tapley Dep. Ex. 12; Brooks Dep. 57, 58). Drake reported to Brooks that she had never seen or heard Brown do or say anything inappropriate. (Brooks Dep. 60; Tapley Dep. Ex. 12). Brooks also spoke with department 775 first shift supervisor, Melinda Jackson, as part of the investigation. (Pl. Dep. 281-282; Brooks Dep. 60, 61). Jackson also told Brooks she had never witnessed Brown say or do anything inappropriate. (Brooks Dep. 60, 61).   The next day after her complaint (April 14, 2004) Businelle went to Meadowcraft's office building in Wadley, asked the lady at the front desk if she could see Kay Brooks to talk to her about Brown and was told by the lady that Brooks was not in and she would be gone for two hours. (Businelle Dep. 139). Businelle never returned to talk to Brooks. (Pl. Dep. 139).

Businelle alleges that, two or three days after her report to Brooks, on April 13, 2004, on one occasion Brown grabbed her on her "butt" on the cheek area with

16

one hand for about one second and said, "I've been wanting to feel that round ass." (Pl. Dep. 132-134, 140). Businelle testified repeatedly that she never reported this alleged grabbing of her rear or accompanying comment to anyone. (Dep. Pl. 134, 135, 142, 243).  Also within a few days of her report to Brooks, Brown started asking her to have sex with her, hollered at her, threw her job cards down one time, and asked her "just where the fuck are you going?" when she walked off her job. (Pl. Dep. 135,136, 245).  Also within these two or three days Brown also told her to get a broom and start fucking sweeping. (Pl. Dep. 150). She asked him why the Mexican women didn't have to sweep, he told her to shut the fuck up, he was going to fire her ass if she didn't shut up and snatched the broom from her. (Pl. Dep. 150, 151, 152). That same night Brown shoved a heavy buggy full of steel toward her but it did not hit her. (Pl. Dep. 153).

According to Businelle, approximately three to four days after her complaint to Brooks, Businelle went to Production Manager Gerry Tapley. (Pl. Dep. 140-142). Businelle testified: "I didn't tell him Tyrone grabbed me. I just told him I could not work for Tyrone Brown anymore." (Pl. Dep. 142). She also allegedly told Tapley that Brown had thrown down her job card, snatched the broom from her, and told her to get off his fucking clock. (Pl. Dep. 153-154).  Businelle also told Tapley that Brown was still asking her for sex and sexually harassing her.

Moreover, Tapley testified that he cut off Businelle when she mentioned something about "pussy" because he thought for her to continue would be too embarrassing for the both of them.  (Businelle Dep. 142, 153-154, 164-168, 289-290; Tapley Dep. 67, 72, 94-96).

Tapley told her that "vulgar comments toward another employee and treating each other unfairly and sexual harassment would not be tolerated at Plantation Patterns." (Pl. Dep. 155; Tapley Dep. 67). Businelle asked if she could be moved to first shift and Tapley told her she could move to first shift. (Pl. Dep. 142, 155; Tapley Dep. 84).  Businelle asked Tapley if her mother could be moved to first shift and Tapley allegedly told her no, but that he was moving everyone in about a week. (Id). Businelle refused the transfer to first shift because she did not have a working car at the time of the transfer and she had to drive her Mom at night due to her mother's impaired night vision.  (Businelle Dep. 14, 145-146, 160). Businelle had to work whatever shift her mother worked.  Id.

After his conversation with Businelle, Tapley spoke with a couple of other employees who worked around Brown and asked them if they had witnessed Brown use profane language or make any kind of sexual comments towards women. (Tapley Dep. 74-76, 78-80). They responded that they had not. ( Tapley Dep. 81, 82).  After Businelle's conversation with Tapley, the only problems she

allegedly had with Brown were that he wouldn't speak to her and he ignored her requests to fix her robot resulting in her not meeting her production number during those final days. (Pl. Dep. 156).  After April 16, 2004 (which is the earliest she alleges she spoke with Tapley), Businelle worked only 7 more days. (Brown Dep. Ex. 4). On April 22, 2004, Businelle was paid $534.44 for 55 hours of work, which was the largest check she had received since January 2004. (Brooks Dep. Ex. 7).

Businelle never reported anything to Brown's female supervisor, Malinda Jackson, even though she "was always in and out" and her office was on the end of the building where Businelle's robot was. (Pl. Dep. 96). Jackson was not Brown's supervisor; rather, Brown and Jackson were both supervisors who reported to Tapley.  (Pl. Decl.; Brooks Dep. 18).  Further, Businelle rarely saw Jackson and, when she did, she was always with Brown.  (Businelle Dep. 96, 135, Pl. Decl.)  Although Businelle also never mentioned anything to female second shift inspector, Elaine Drake, she did tell Elaine Drake that Brown was ignoring her, and asked her to get Brown to fix her robot, but Brown never did. (Pl. Dep. 97; Businelle Dep. 60).  On one occasion,  Drake saw Businelle crying and asked her why she was crying; Businelle told her it was "nothing." (Pl. Dep.177). Businelle never filed a grievance of any kind pursuant to her rights under the collective bargaining agreement. (Pl. Dep. 248; Tapley Dep. Ex. 10 at Art. 9).

On April 24, 2004, Businelle went to the emergency room for reasons unrelated to anything at Meadowcraft. (Pl. Dep. 201, 202; Ex. 9). She was released by her doctor to return to work on April 25, 2004. (Pl. Dep. 202, 203; Ex. 9). Businelle and her mother were scheduled to work on April 25, 2004; however, they did not come to work. (Pl. Dep. 203; Brown Dep. Ex. 4). Businelle concedes that her absence on April 25, 2004 was unexcused. (Pl. Dep. 203). On April 26, 2004, Brown handed both of them documented verbal warnings for their unexcused absence. (Pl. Dep. Ex.8; C.Businelle Dep. Ex.1). A verbal warning was the appropriate response to an unexcused absence under the attendance policy at that time. (Brooks Dep. 182, 183, 184; Ex. 5 at M0363; Pl. Dep. 199). Brown never spoke to Businelle on April 26, 2004, other than to hand her the documented warning.  (Pl. Dep. 207, 210).

After receiving the documented verbal warning for their unexcused absences on April 26, 2004, Businelle and her mother quit and never returned to Meadowcraft, other than to pick up their last paycheck. (Pl. Dep. at 158 225, 226, 246; Brown Dep. Ex.4). Businelle spoke with Brown's supervisor Malinda Jackson when she picked up her check, but Businelle never told Jackson why she quit. (Pl. Dep. 246). Businelle's last check reflecting a full work week was issued on April 29, 2004 and was for $477.48, which (other than the prior week's check) was the highest amount she had earned since January 2004. (Brooks Dep. Ex. 7).

## IV.  Applicable Substantive Law and Analysis

**<u>Gender Harassment</u>**

Plaintiff Businelle asserts that she was subjected to harassment based on her gender (as opposed to sexual harassment) resulting in a hostile environment that discriminatorily altered the terms and conditions of her employment. The Defendant Meadowcraft asserts that Plaintiff Businelle cannot establish that (1) Defendant Brown's alleged conduct was based on her gender and (2) that the alleged conduct rises to the severe and pervasive level necessary for a hostile environment claim.

A hostile work environment claim under Title VII is established upon proof that the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.  Civil Rights Act of 1964, §701 <u>et seq</u>. as amended, 42 U.S.C.A. §2000 <u>et seq</u>.  To establish a hostile work environment claim, an employee must show: (1) that [s]he belongs to a protected group; (2) that [s]he has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee, such as gender; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such

21

environment under a theory of vicarious or of direct liability.  Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002).

It is undisputed that Plaintiff Businelle belongs to a protected group; she's a female.  Plaintiff Businelle alleges that Defendant Brown subjected her to unwelcome harassment and that the harassment was based on her gender.  Plaintiff Businelle alleges that Defendant Brown (1) cursed and yelled at her including calling her a "Streetwalker" and saying she was "fucking stupid," (2) snatched a broom from her hand and threatened her with it, (3) grabbed her arms so hard that he left bruises on them,  (4) on one occasion shoved her, and (5) occasionally refused to fix her robot.  Plaintiff Businelle asserts that there is no evidence that Defendant Brown engaged in similar conduct with men.  Although Plaintiff Businelle asserts that Defendant Brown did not engage in similar conduct with men, Plaintiff has not presented sufficient evidence that Defendant Brown's alleged conduct was based solely on her gender.  For instance, there is evidence that while on one occasion when Defendant Brown directed Plaintiff Businelle "to get a broom and start fucking sweeping," she noted that when the other women ran out of parts to work on, Defendant Brown did not make them sweep.  (Businelle Dep. 150-151; C. Businelle p. 84-85).  Plaintiff Businelle does not present sufficient evidence that Defendant Brown's alleged statements or conduct were solely based on her gender.  The Court finds that Plaintiff Businelle was subjected

to unwelcome harassment.   However, Plaintiff Businelle has not presented sufficient evidence that the harassment was solely based on her gender. Accordingly, the Defendant's motion for summary judgment as to Plaintiff's gender harassment claim is due to be granted.

## Sexual Harassment

Plaintiff Businelle asserts a sexual harassment hostile work environment claim.  As noted above, to establish a hostile work environment claim, an employee must show: (1) that [s]he belongs to a protected group; (2) that [s]he has been subject to unwelcome  harassment; (3) that the harassment must have been based on a protected characteristic of the employee, [such as her sex]; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under a theory of vicarious or of direct liability.  Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002).

The parties concede that Plaintiff Businelle has evidence that, if believed, would establish the first four elements of a claim of sexual harassment.  However, the Defendant Meadowcraft asserts that she cannot establish the fifth element of the prima facie case, that Defendant Meadowcraft is responsible for the alleged hostile environment under a theory of vicarious or of direct liability.

23

An employer is subject to vicarious liability under Title VII to a victimized employee for actionable discrimination caused by a supervisor.[7] Faragher v. City of Boca Raton, 524 U.S. 775(1998); Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1998). However, an employer may invoke an affirmative defense to avoid liability.[8] The Defendant asserts that there is no basis for holding Meadowcraft liable for Brown's alleged conduct because it has satisfied the affirmative defense. The Faragher/Ellerth affirmative defense allows an employer to avoid liability for a supervisor's sexual harassment of an employee by proving that: 1) it exercised reasonable care in preventing and promptly correcting any sexually harassing behavior; and 2) the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm

---

[7] It is uncontested that Brown was a supervisor within the meaning of Faragher.

[8] Businelle did not allege in her complaint, but she testified in her deposition that, at some unspecified time in 2003, Brown promoted her to an assistant lead position and that three days thereafter, he removed those duties from her because she would not have sex with him. (Pl. Dep. 105). Plaintiff asserts that this demotion constitutes a tangible employment action subjecting the Defendant to strict liability for sexual harassment without the availability of an affirmative defense. The Plaintiff has not presented any evidence to show that the lead position was a promotion; thereby, losing the position isn't enough to show that it was a tangible employment action. Assuming, however, that the demotion constitutes a tangible employment action, Plaintiff Businelle's claim fails because she has not presented sufficient evidence to establish that the Defendant's proffered reasons are a pretext for discrimination. Meadowcraft has proffered a legitimate non-discriminatory reason for the decision. Specifically, Brown alleges he demoted Plaintiff because of a report from an hourly employee that Businelle could not get along with her co-workers. (Brown Dep. 19, 21-24). See Frederick v. Sprint/ United Mgmt. Co., 246 F.3 1305, 1312-1313 (11th Cir. 2001); Taylor v. CSX Transp., 418 F.Supp. 2d 1284. The Court finds that Plaintiff has not presented sufficient evidence to establish that the Defendant's proffered business reason is a pretext for discrimination.

otherwise. See Faragher, 524 U.S. at 807; Walton, 347 F.3d at 1286; Madray v. Publix Supermarkets, Inc., 208 F.3d 1290, 1296-1297 (11th Cir. 2000).

In determining whether an employer can establish the affirmative defense, the court must first determine "whether the employer has exercised reasonable care in preventing sexually harassing behavior." Walton, 347 F.3d at 1286; Coates, 164 F.3d at 1369. The Court in Faragher "implied that employers could meet the initial burden in determining whether they had exercised reasonable care to prevent sexual harassment by promulgating a sexual harassment policy." Madray, 208 F.3d at 1297-98. In fact, dissemination of an employer's anti-harassment policy clearly satisfies the requirement for exercising reasonable care in preventing sexual harassment. Id. The Eleventh Circuit has made it clear in Frederick v. Sprint/United Management Co., that "an employer's showing that it has a sexual harassment policy does not automatically satisfy its burden" on the first element. 246 F.3d 1305, 1313-14 (11th Cir.200). The employer must also show "that its sexual harassment policy was effectively published, that it contained reasonable complaint procedures, and that it contained no other fatal defect." Id.

Meadowcraft asserts that it exercised reasonable care to prevent harassment because it widely disseminated policies prohibiting sexual harassment and providing for equal employment opportunities. (Pl. Dep. Ex. 3, 4). The sexual harassment policy outlines various examples of sexual harassment and both

25

policies instruct employees on how to report alleged harassment or discrimination of any kind. (Id.). Moreover, Meadowcraft trains its managers and salaried employees, including Brown, annually on these policies. (Brooks Dep. 15,16). Also, Brooks, the Human Resources Manager during Businelle's employment, distributed annually the harassment and equal opportunity policies to non-management employees. (Brooks Depo., pp. 61-63).

Further, Defendant Meadowcraft asserts that it acted reasonably to "correct promptly any sexually harassing behavior." Defendant Meadowcraft asserts that Businelle never reported the vast majority of the specific details of "constant" demands for sex and threats for which she seeks to hold Meadowcraft liable in this lawsuit. The Defendant asserts that, instead, on April 13, 2004, Businelle made a report to Brooks of one specific vulgar comment Brown allegedly made to her (which could be substantiated by no one, including Businelle's own mother) and a general complaint of "cussing and yelling." When Tapley spoke with Businelle a few days later, her complaint again was almost entirely generalized and did not include the alleged sexual conduct she has asserted in this case. Meadowcraft asserts that its  response was entirely reasonable based on the limited (and unsubstantiated) information Businelle provided.  In addition, Defendant Meadowcraft asserts that, when the Defendant offered to transfer Businelle to a different shift than Brown, she declined.

26

The Plaintiff asserts that once Defendant Meadowcraft had notice of the sexual harassment, it failed to take prompt remedial action and Plaintiff Businelle suffered additional sexual harassment.   Plaintiff Businelle asserts that the Defendant failed to take prompt remedial action because it failed to monitor Defendant Brown's behavior, failed to confront Brown about Plaintiff's allegations of sexual harassment, and failed to caution Defendant Brown about engaging in sexual harassment.  Defendant Brown testified that he had no idea he had been accused of the sexual harassment or sexual comment until receiving Businelle's complaint in the mail, a year later.  (Brown Dep. 189-190, 192, 198, 201, 209-210).

The Court finds that there are genuine issues of material fact as to whether the Defendant Meadowcraft exercised reasonable care in preventing and promptly correcting any sexually harassing behavior.

Even assuming, however, that Defendant Meadowcraft has satisfied the first prong of its affirmative defense to liability, the Court finds that there are genuine issues of material fact as to whether Plaintiff Businelle unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.  The Defendant asserts that Plaintiff failed to take advantage of any preventive or corrective opportunities provided by Meadowcraft because she failed to report the alleged acts of harassment for up to two years.  The Defendant further asserts that, even when Businelle did complain, she failed to

27

provide sufficient details to put Defendant Meadowcraft on notice of the alleged severity and pervasiveness of the harassment.

Plaintiff asserts that her failure to promptly report the harassment when it first occurred was reasonable under the circumstances.  The Eleventh Circuit has found that "in some case, the proof will show that the employee's non-compliance [with complaint procedures] was reasonable under the circumstances and, in these cases, the Defendant cannot satisfy the second element of the affirmative defense." The Plaintiff asserts that Businelle was only twenty years old at the time of reporting the incident; Meadowcraft was her first job; she feared retaliation for reporting sexual harassment; Defendant Meadowcraft's policies had no anti-retaliation language; she received no sexual harassment training, she was not given a copy of the sexual harassment policy she signed; there was no sexual harassment policy posted in the building she worked; the harassment happened on the night shift when there was no one from human resources present; and Brown was the highest level supervisor in the plant during the night shift.

Upon review of the record, the Court finds that there are genuine issues of material fact as to whether Plaintiff Businelle unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.  Accordingly, the Defendant's motion for summary judgment as to Plaintiff Businelle's sexual harassment claim is due to be denied.

**Constructive Discharge**

Plaintiff Businelle alleges that the environment that she worked in was so hostile and abusive that Plaintiff Businelle was forced to abandon her position against her will. "A constructive discharge occurs when a discriminatory employer imposes working conditions that are 'so intolerable that a reasonable person [in the employee's] position would have been compelled to resign'" Fitz v. Pugmire Lincoln-Mercury, Inc., 348 F.3d 974, 978 (11th Cir.2003) (quoting Poole v. Country Club of Columbus, Inc., 129 F.3d 551, 553 (11th Cir.1997)). In Pennsylvania State Police v. Suders, 524 U.S. 129, 124 S.Ct. at 2342, 159 L.Ed.2d 204 (2004), the United States Supreme Court set forth the elements of a constructive discharge under Title VII:

> To establish constructive discharge , the plaintiff must make a further showing: She must show that the abusive working environment became so intolerable that her resignation qualified as a fitting response.

Suders, 124 S.Ct. at 2347. "Mere harassment, alone, is insufficient; rather, the plaintiff must show 'aggravating factors' to justify departure." Hockman v. Westward Comm., LLC, 122 Fed. Appx. 734 (5th Cir.2004).   Plaintiff Businelle alleges that after she reported Brown's alleged harassment to Brooks and Brooks reported it to Tapley, Brown continued to supervise Plaintiff and his harassment grew even more threatening.  Plaintiff asserts that when her complaint to Brooks

in Human Resources failed to stop Brown, she went directly to Tapley, the highest level manager at the plant.  Tapley offered to transfer Plaintiff Businelle to first shift but she declined the offer when Tapley informed her that he could not move her mother to first shift as well.  Plaintiff Businelle alleges that, after her conversation with Tapley, the only problems she had with Brown were that he wouldn't speak to her and he ignored her requests to fix her robot resulting in her not meeting her production number during those final days.  (Pl. Dep. 156).  The Defendant provided evidence that, after April 16, 2004 (which is the earliest she alleges she spoke with Tapley), Businelle worked only 7 more days. (Brown Dep. Ex. 4). On April 22, 2004, Businelle was paid $534.44 for 55 hours of work, which was the largest check she had received since January 2004. (Brooks Dep. Ex. 7).

Upon review of the record, the Court finds that Plaintiff Businelle has not presented sufficient evidence that the abusive working environment became so intolerable that her resignation qualified as a fitting response.[9]  Accordingly, the Defendant's motion for summary judgment as to the Plaintiff's constructive discharge claim is due to be granted.

---

[9] After Plaintiff Businelle filed her complaint, the Defendant reprimanded Brown at least to the verbal insults, offered to transfer Plaintiff Businelle to the first shift which she declined, informed Plaintiff Businelle that the Defendant was going to move the second shift to the first shift within approximately a week, and Tapley conducted an investigation pertaining to Plaintiff's allegations.  However, Plaintiff Businelle quit within a week after speaking with Tapley.

**Punitive Damages**

Plaintiff Businelle asserts that the Defendant should be subjected to punitive damages under 42 U.S.C. § 1981a because Brown testified that no one ever spoke to him during Businelle's employment to determine whether he had sexually harassed Businelle.  Further, Tapley acknowledged that he cut Businelle off when she tried during her second complaint to provide additional details of Brown's sexually harassing behavior.

The Supreme Court has recognized expressly that there is a higher standard of liability for punitive damages than for compensatory damages under Title VII. Kolstad v. American Dental Association, 527 U.S. 526, 534 (1999).  "[P]unitive damages may only be considered in cases where the 'discriminating employee was high[] up the corporate hierarchy' or where 'higher management countenanced or approved [his] behavior.'" Miller v. Kenworth of Dothan, Inc., 277 F. 3d 1269, 1280 (11th Cir. 2002)  (internal citations omitted). The Defendant asserts that, Plaintiff Businelle cannot meet her burden of establishing a jury issue as to malice or reckless indifference on the part of a Meadowcraft employee sufficiently high up in the corporation. See Miller, 277 F.3d at 1280.  The Defendant asserts that even assuming Brown can be considered a supervisor, he was on the lowest rung of the organizational chart of salaried employees for Meadowcraft's Wadley plant. (Tapley Dep. Ex. 15).

Plaintiff Businelle asserts that Brooks and Tapley responded in a reckless and malicious manner when she filed her complaints.   The Defendant provided evidence that York was informed by Brooks of Plaintiff's complaint.   There is no evidence that York "countenanced or approved" Brown's alleged behavior. It undisputedly had been reported to York by Brooks that Businelle's claims could not be substantiated. (York Dep. 56, 57). Moreover, there is no evidence that Mr. York ever was aware that Brown allegedly acted inappropriately after Businelle's complaint to Brooks. See Wilbur v. Correctional Services Corp., 393 F.3d 1192 (11th Cir. 2004) (punitive damages improper where, even if corporate office had notice of the plaintiff's complaints, employee failed to establish the employer's higher management countenanced or approved the offending behavior).   Further, the Defendant provided evidence that it promptly conducted an investigation and provided Plaintiff with an option of working on the first shift.

Upon review of the record, Plaintiff has not presented sufficient evidence that any higher management employee of the Defendant, including Brooks, Tapley, and York, acted with malice or with reckless indifference to the Plaintiff's federally protected rights.   The Defendant's motion for summary judgment as to Plaintiff's punitive damages claim is due to be granted.

**State Law Claims**

**Invasion of Privacy and Assault and Battery**

32

Plaintiff Businelle alleges in her complaint an invasion of privacy claim and an assault and battery claim against Defendant Brown and Defendant Meadowcraft.[10]  Plaintiff Businelle alleges that Defendant Brown's touchings, requests for sex, inquiries and comments about her sexual relationship with her boyfriend, and questioning of Plaintiff Businelle regarding her virginity constituted an invasion of Plaintiff Businelle's privacy.  In addition, Plaintiff Businelle alleges that Defendant Brown's touchings, including but not limited to, the grabbing of Plaintiff's arms and buttocks, constitute an assault and battery.  Plaintiff Businelle alleges that Defendant Meadowcraft authorized, ratified, and/or condoned Defendant Brown's, its agent, actions which amounted to an invasion of Plaintiff's privacy.

The Alabama Supreme Court recognizes that the invasion of privacy tort consists of four distinct wrongs: 1) intrusion upon the plaintiff's physical solitude or seclusion; 2) publicity which violates the ordinary decencies; 3) putting the plaintiff in a false, but not necessarily defamatory, position in the public eye; and 4) the appropriation of some element of the plaintiff's personality for a commercial use.  See Phillips v. Smalley Maintenance Servs., 435 So.2d 705, 708 (Ala. 1983).  Plaintiff Businelle's action for invasion of privacy is premised upon that species of invasion known as a wrongful intrusion into one's private activities.  The

---

[10] The Defendant Meadowcraft moves for summary judgment as to all claims against it.

Alabama Supreme Court has defined the tort as the wrongful intrusion into one's private activities in such a manner as to outrage or cause mental suffering, shame, or humiliation to a person of ordinary sensibilities. <u>Phillips</u>, 435 So.2d at 705; Restatement (Second) of Torts § 652B (1977).  To succeed on a claim alleging invasion of privacy relating to sexual harassment, a plaintiff must show: (1) that the matters intruded into are of a private nature; and (2) that the intrusion would be so offensive or objectionable that a reasonable person subjected to it would experience outrage, mental suffering, shame, or humiliation.  <u>See</u> <u>Ex parte</u> <u>Atmore Community Hospital</u>, 719 So.2d 1190, 1194 (Ala. 1998).

Plaintiff Businelle also alleges in her complaint an assault and battery claim against Defendant Brown and Defendant Meadowcraft.    Under Alabama law, an "assault" is defined as "an intentional, unlawful offer to touch the person of another in a rude or angry manner under such circumstances as to create in the mind of the party alleging the assault a well-founded fear of an imminent battery, coupled with the apparent present ability to effectuate the attempt, if not prevented." <u>Wood v. Cowart Enterprises, Inc.</u>, 809 So.2d 835, 837 (Ala. 2001)(quoting <u>Western Union Tel. Co. v. Hill</u>, 150 So. 709, 710 (Ala. 1993)).  In a civil action, to establish a claim for battery, a plaintiff must show "(1) that the defendant touched the plaintiff; (2) that the defendant intended to touch the plaintiff; and (3) that the touching was conducted in a harmful or offensive manner." <u>Wood</u>, 809 So.2d at

34

837; see also Ex parte Atmore Community Hospital, 719 So.2d 1190 (Ala. 1998).
An actual injury to the body is not a necessary element of a civil assault and
battery.  Surrency v. Harbison, 489 So.2d 1097, 1104 (Ala. 1986).

Defendant Meadowcraft asserts that, even assuming Plaintiff Businelle can
satisfy the initial elements of her claims for invasion of privacy and assault and
battery, Meadowcraft is not liable for Brown's alleged conduct.  "The law in
Alabama is well settled that an employer is not liable for the intentional acts of its
employee unless the acts were committed within the scope of the employee's
employment or were done to further the interests of the employer." East Ala.
Behavioral Medicine P.C. v. Chancey, 883 So.2d 162, 166 (Ala. 2003).  Defendant
Meadowcraft has presented evidence that Defendant Brown's actions were
personal to him and were neither condoned by the employer nor within the scope
of his employment.  Alabama courts have held that sexual misconduct is personal
to the employee and is outside of the scope of employment.  Joyner v. AAA Cooper
Transp., 477 So.2d 364 (Ala. 1985) (holding that a manager's attempt to force
other employees to perform sexual acts was not in furtherance of the company's
business).   Under Alabama law, "an employer is not liable under the doctrine of
respondeat superior when the employee acts for his or her own personal gain and
not in furtherance of the employer's business.  Doe v. Swift, 570 So.2d 1209, 1213
(Ala. 1990); Solmica of Gulf Coast, Inc. v. Braggs, 285 Ala. 396, 232 So.2d 638

(1970).  The Court finds that Defendant Meadowcraft is not liable under the doctrine of respondeat superior.

In addition to vicarious liability under the doctrine of respondeat superior, "an employer can also be held liable for the unlawful acts of its employee if the employer ratifies those acts."  Potts v. BE & K Constr. Co., 604 So.2d 398, 400 (Ala. 1992).  "An employer ratifies an act when 1) it expressly adopts the employee's behavior or 2) it implicitly approves the behavior." Id. at 400. "Acquiescence or ratification requires full knowledge or means of knowledge of all material facts." Furthermore, "[a]n employer's failure to stop the tortious conduct after it learns of the conduct will support an inference that the employer tolerated the conduct." Id.  "An employer cannot be said to have ratified an employee's conduct when the employer, upon learning of an employee's conduct, which was not in the scope of the employee's employment, gives instructions calculated to prevent a recurrence." Joyner, 477 So.2d at 365 (after an employee's homosexual advances to another employee were reported to the employer, the employer conducted an investigation and informed the offending employee that if another complaint of this nature came to the employer's attention, the offending employee would be laid off and a full-scale investigation conducted).

Defendant Meadowcraft asserts that Plaintiff Businelle did not provide Meadowcraft with full knowledge of the facts regarding the alleged sexual

harassment.    Further, Defendant Meadowcraft asserts that, after Plaintiff Businelle's report, the Defendant conducted an investigation and Tapley instructed Defendant Brown that if he found any truth to Plaintiff Businelle's allegations or if any such conduct occurred in the future he would be fired.  Plaintiff Businelle provided evidence that she reported the alleged sexual harassment to Brooks and Tapley.  It is undisputed that the Defendant spoke to Brown about his treatment of Plaintiff Businelle.  However, it is disputed whether the Defendant reprimanded Brown for his alleged sexual harassment of Plaintiff Businelle or just the foul language he used towards her.  Brown testified that Tapley never asked him whether he had been making sexual comments or advances towards Businelle, and only asked him if he had been cursing and yelling at Businelle.  (Brown Dep. 183-186, 189; Tapley Dep. 110; Tapley Dep. EX 6; Brooks Dep. 57).   Further, Defendant Brown testified that he had no idea he had been accused of the sexual harassment or sexual comments until receiving Businelle's complaint in the mail, a year later.  (Brown Dep. 189-190, 192, 198, 201, 209-210).

The Court finds that there are genuine issues of material fact as to whether Defendant Meadowcraft ratified the conduct of Defendant Brown.  Therefore, the Defendant's motion for summary judgment as to Plaintiff's invasion of privacy claim and assault and battery claim is due to be denied.

**Negligent Supervision and Retention**

Plaintiff alleges that the Defendant Meadowcraft negligently retained and failed to supervise Defendant Brown.  In order to prevail on a claim of negligent supervision, Plaintiff Businelle must demonstrate "by affirmative proof that the alleged incompetence of the [problem] employee[s] was actually known to the employer or was discoverable by the employer if it had exercised care and proper diligence." Portera v. Winn Dixie of Montgomery, Inc., 966 F. Supp. 1418, 1438 (M.D. Ala. 1998)(citing Ledbetter v. United Am. Ins. Co., 624 So. 2d 1371 (Ala. 1993)).  It is an essential element of a negligent supervision claim that the employer or principal have actual or constructive knowledge of the offending conduct or tort committed by his employee or agent.  Pescia v. Auburn Ford-Lincoln Mercury, Inc., 68 F. Supp. 2d 1269, 1280 (M.D. Ala. 1999).  See also Portera, 996 F. Supp. at 1439 (without evidence of prior complaints of sexual harassment, there was no evidence from which the employer could know that the supervisor created a hostile working environment).

Prior to Plaintiff Businelle's complaint, Defendant Meadowcraft was not aware of Defendant Brown's alleged sexual harassment of Plaintiff Businelle. However, after Plaintiff Businelle spoke to Brooks about the alleged sexual harassment, and Brooks spoke promptly to Tapley, Brown allegedly continued to harass the Plaintiff by grabbing her buttocks, snatching a broom from her, and

harassing her verbally.  As a result of the continued harassment, Plaintiff Businelle filed a complaint with Tapley.  The Defendant asserts that Tapley informed Brown that sexual harassment would not be tolerated.  Brown testified that Tapley only reprimanded him for cursing and yelling at Plaintiff.   Upon review of the record, the Court finds that there are genuine issues of material fact as to whether the Defendant negligently failed to supervise Defendant Brown.

In regard to Plaintiff Businelle's claim of negligent retention, Alabama law requires an employer to "use due care to avoid the ... retention of an employee whom [the employer] knows or should know is a person unworthy, by habits, temperament, or nature, to deal with the persons invited to the premises by the employer." Brown v. Vanity Fair Mills, Inc., 277 So.2d 893, 894 (Ala. 1973).  For a master to be held liable for its servant's incompetency, it must be affirmatively shown that, had the master exercised due and proper diligence, the master would have learned of incompetency.  This showing  may be done by showing specific acts of incompetency and showing that they were brought to the knowledge of the master, or by showing them to be of such a nature, character, and frequency that the master, in the exercise of due care, must have had notice of them.  Mardis v. Robbins Tire & Rubber Co., 669 So.2d 885 (Ala. 1995). To recover for negligent retention in Alabama, a plaintiff must show breach of that duty and that such breach proximately caused the plaintiff's injury.  Patterson v. Augat Wiring

Systems, Inc., 944 F. Supp. 1509, 1529 (M.D. Ala. 1996). Isolated incidents of negligence by the employee will not suffice to create a duty to terminate the problem employee.

> Negligence such as unfits a person for service, or such as renders it negligent in a master to retain him in the employment, must be habitual, rather than occasional, or of such a character as to render it imprudent to retain him in service. A single exceptional act will not prove a person incapable or negligent.

Bank of Montgomery v. Chandler, 39 So. 822, 828 (Ala. 1905). Plaintiff Businelle has presented evidence that she informed Defendant Meadowcraft of the alleged harassment. The Court finds that Plaintiff Businelle has raised a genuine issue of material fact as to whether the Defendant Meadowcraft negligently retained Plaintiff's alleged harasser. Accordingly, the Defendant's motion for summary judgment as to Plaintiff's negligent retention and supervision claims is due to be denied.

### **Wanton and Malicious Retention and Supervision**

Plaintiff alleges that Defendant Meadowcraft wantonly and maliciously retained and failed to supervise Defendant Brown resulting in her being subjected to abuse. Plaintiff Businelle alleges she suffered severe emotional distress as a result.

> To prove wantonness, it is not essential to prove that the defendant
> entertained a specific design or intent to injure the plaintiff.
> "Wantonness" is defined by statute as "[c]onduct which is carried on
> with a reckless or conscious disregard of the rights or safety of others
> . . . (T)his court described wantonness as the conscious doing of some
> act or the omission of some duty, while knowing of the existing
> conditions and being conscious that, from doing or omitting to do an
> act, injury will likely or probably result.

Machen v. Childersburg Bancorporation, Inc., 761 So.2d 981, 986 (Ala.

1999)(quoting Alfa Mutual Insurance Co. v. Roush, 723 So.2d 1250,1256 (Ala.

1998).  Plaintiff Businelle has not demonstrated that the Defendant Meadowcraft

carried out its handling of Plaintiff's Businelle's complaint of alleged sexual

harassment with a reckless or conscious disregard of Plaintiff's rights or safety.

The Defendant presented evidence that it responded to Plaintiff Businelle's

complaint by conducting an investigation, notifying other managers of Plaintiff's

complaint, reprimanding Plaintiff Brown at least to the verbal abuse of Plaintiff,

and offering Plaintiff a position on first shift.  Accordingly, the Defendant's motion

for summary judgment as to Plaintiff Businelle's wanton supervision and retention

claims is due to be granted.

## V. Conclusion

For the reasons set forth above, the Defendant's motion for summary

judgment as to Plaintiff's federal discrimination and state law claims is due to be

denied in part and granted in part .

41

**DONE** and **ORDERED** this 18th day of July, 2006.

**VIRGINIA EMERSON HOPKINS**

**United States District Judge**